# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14-cr-384-2 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| KIERRE WATERFORD, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Kierre Waterford's motion to suppress [80] is denied.

## STATEMENT

Defendant Kierre Waterford ("Defendant") filed a motion to suppress in which he asserts that his statements to the police and waiver of his *Miranda* rights on April 8, 2014, were involuntary and coerced by law enforcement. (Def.'s Mot. to Suppress, [Dkt. # 80], at 1-9.) He alleges he was incapable of knowingly and voluntarily waiving his *Miranda* rights at the time of his confession because he was under the influence of various mind altering controlled substances, and thus argues that his confession and statements should be barred from use in the government's case in chief.

I.   Background

At an evidentiary hearing on June 10, 2015, the government called four witnesses, all of whom stated that the Defendant was coherent at the time he waived his *Miranda* rights and that he did not suggest, in any way, that he was high or otherwise incapable of understanding what he

was doing. Defendant, however, testified that he took a particularly strong cocktail of drugs on the day of his arrest: (1) in the morning at a friend's house, six to seven blunts of marijuana, hallucinogenic mushrooms, one ecstasy pill, and one Xanax pill; (2) while driving later that morning, one blunt of marijuana; and (3) when stopped by law enforcement, two Xanax pills, three Percocet pills, and a "handful" of mushrooms. (Mot. to Suppress at 2.) He further called an expert witness who suggested that *if* Defendant consumed the drugs he claims, then he would have been incapable of giving a knowing, voluntary waiver of his rights. What we have, then, is a classic he-said she-said.

   *(a) The Government's Version of Events*

At approximately 12:40 p.m. on April 8, 2014, Officer Andrew Isom of the Marion, Ohio Police Department participated in a stop of two vehicles that were supposedly transporting illegal firearms. (6/10/15 Evid. Hearing Tr., [Dkt. # 143], at 7.) Officer Isom pulled in front of one of the vehicles, a blue SUV, and blocked its path. (*Id.* at 7-8). At that point, his driver-side door was just feet from the SUV's passenger-side door. (Gov't Mem. in Opp'n, [Dkt # 153], Ex. 7.) Officer Isom recognized the passenger inside as the Defendant, Kierre Waterford, whom he also knew to be a drug dealer. (Evid. Hearing Tr. at 10.) Officer Isom immediately removed Defendant from the car, put him on the ground, handcuffed his hands behind his back, and read him his *Miranda* warnings. (*Id.* at 11.)

   Significantly, because he feared that Defendant might have been carrying a weapon, Officer Isom remained focused on Defendant from the instant he first saw him. (*Id.*) At no point did he see Defendant raise his hands to his mouth as if to swallow something. (*Id.*) Moreover, contrary to Defendant's assertions, Isom testified that neither Defendant nor the SUV smelled of

marijuana. (*Id.* at 14.)

Roughly three hours later, Special Agent Joseph Waller and ATF Task Force Officer Larry Thomas interviewed Defendant at the Marion City Police Department. (*Id.* at 38-39, 80-81). Detective Michael Wheeler observed part of the interview from the viewing room next door. (*Id.* at 107.) Agent Waller again advised the defendant of his *Miranda* rights by both reading them from a waiver form and allowing the defendant to read the form as well. (*Id.* at 39-40.) After indicating that he was willing to speak to the agents, Defendant signed the waiver form. (*Id.* at 43.)

In response to Agent Waller's questions, Defendant provided two telephone numbers and addresses where he resided. (*Id.* at 44.) He then volunteered that, prior to his arrest, earlier that morning, he smoked marijuana and ate some hallucinogenic mushrooms. (*Id.* at 45.) This came as a great surprise to Agent Waller, since Defendant had not suggested to *any* officer that he was high, much less hallucinating.[1] (*Id.* at 46, 86). Nonetheless, Agent Waller proceeded as follows:

> We came back into the room, and we asked him specifically, are you still high, do you still feel any effects; and [Waterford] denied being high. We asked [Waterford] if he was aware of his surroundings, if he was aware of where he was at, and he told us he knew where he was at. And we asked [Waterford] if he knew what had happened that day, and he told us that he was aware.[Waterford] didn't appear high and his eyes were not glazed over or bloodshot. He was coherent. He was articulate. So we proceeded with the interview.

(*Id.* at 46). Agent Thomas likewise testified that Defendant did not appear high or intoxicated, and thus, both him and Agent Waller continued the interview without hesitation. (*Id.* at 76, 88, 90.)

---

[1] Defendant curiously failed to mention the many other drugs that he was supposedly under the influence of, such as Xanax, Percocet, and ecstasy.

Initially, Defendant denied any knowledge of transporting firearms from Ohio to Chicago, but when he was confronted with specific facts about his dealings, he let loose:

- He provided details with respect to whom he traveled with, how long he stayed, and how he was arrested in Charleston, Illinois.
- He admitted being present at the apartment of a person named Griffith and breaking open a safe with several other persons.
- He further explained that inside the safe they found eight gun bags, two Henry rifles, two revolvers, two boxes of ammunition, and jewelry, including a man's ring.
- He stated that he kept the two boxes of ammunition and recalled selling one for $15 but could not recall what he did with the other box.
- Contrary to his prior testimony, he admitted knowing about transporting guns from Ohio to Chicago and recounted specific details to the agents.[2]
- Lastly, he identified four photographs of persons he recognized by writing the person's name, his initials, and the date on the photograph.

(*Id.* 47-50.) On top of this fact-specific, detailed testimony, Agent Waller also noted that Defendant remained alert and awake for all four hours of the interview and never fell asleep or dozed off. (*Id.* at 70.)[3]

Once the questioning was over, Agent Waller reduced Defendant's statements to writing. (*Id.* at 54.) This statement contained details regarding the dates of the trips to Chicago, the types of guns transported to Chicago, and the names of other participants that were unknown to the police prior to Defendant's interview. (*Id.* at 58-59.) Defendant then reviewed the statement, found numerous errors, and made corrections, which he initialed. (*Id.* at 56-57.) Defendant then

---

[2] For example, Defendant stated that he made approximately six trips beginning in February 2014, and that his friend – Aubrey Burks – would trade the guns for heroin in Chicago. (Tr. 50-51). He also explained who they sold the guns to in Chicago, a third party nicknamed "Pee Wee." (*Id.* at 51.)

[3] Although he was not present in the room for the entire interview, Detective Wheeler also testified that based upon his prior interactions with Defendant, he did not believe that Defendant was high or intoxicated. (*Id.* at 111.)

asked what he would be charged with and questioned whether the federal agents had the right to accuse him of state law violations. (*Id.* at 59, 96)

Taken together, the officers' testimony suggests that Defendant showed no signs of cognitive difficulty, trouble, or confusion during the interview. To the contrary, they claim that Defendant was alert and aware, and that their prior experience with him only reinforced this conclusion. The officers also denied threatening Defendant or making any promises to him. Thus, on their account, this was a straightforward interview and Defendant's waiver of *Miranda* rights and subsequent confession were made knowingly, voluntarily, and intelligently.

*(b) Defendant's Version of Events*

Defendant's recitation of the facts was notably different. According to him, at approximately 9 o'clock in the a.m. of the date of his arrest, he smoked six blunts of marijuana, ingested one Xanax pill, one ecstasy pill, and five to six grams of hallucinogenic mushrooms. (*Id.* at 141.) Later, while in the SUV, he smoked another marijuana blunt, and, when he saw the police car approaching, he ingested an additional six grams of hallucinogenic mushrooms, two Xanax pills, and three Percocet pills. (*Id.* at 154-58.) As a result, he claimed that during his interview he was seeing double and feeling drowsy, sleepy, and lazy. (*Id.* at 152.)

Defendant then testified about various apparent inconsistencies in his story. He admitted denying, at the scene of his arrest, that he had swallowed anything. (*Id.* at 153.) But he claimed he did this in order to avoid being charged with violating the conditions of his bond. (*Id.*) He acknowledged signing the *Miranda* waiver form but denied ever having read it. (*Id.*) He claimed that an officer asked him if he was high and that he responded by admitting he had smoked marijuana and consumed mushrooms, which apparently prompted one of the interviewing

officers to remark "we should not be doing this." (*Id.* at 156-57.) Similarly, regarding his signed statement, Defendant recognized his signature on the document, but maintained that he had never seen it before it was produced by the government for these proceedings. (*Id.* at 162-63.) Yet, despite not having seen the document, Defendant further explained that he signed it because he was told by one of the officers that he would be allowed to go home and sleep in his own bed that evening if he did so. (*Id.*)[4]

Beyond his own account, Defendant also had Dr. Steven Aks, an emergency physician and medical toxicologist, testify on his behalf. (*Id.* at 224.) Dr. Aks has clinical, first-hand experience regarding the effects of marijuana, heroin, cocaine, amphetamines, methamphetamines, ecstasy and related compounds, synthetic cannabinoids, and hallucinogens on the human mind. (*Id.* at 224-28.) And he has treated, and conducted research on the treatment of, individuals who have swallowed taken substances in order to avoid arrest. (*Id.*)

As part of a hypothetical question, Dr. Aks was asked to assume that Defendant ingested or smoked seven or eight blunts of marijuana, an ecstasy pill, three Xanax, three Percocet, and approximately twelve grams of hallucinogenic mushrooms. (*Id.* at 234.) Under these circumstances, Dr. Aks opined that Defendant would have been impaired to the point of being unable to carry out normal daily functions.[5] (*Id.* at 234-39.) Particularly, he testified that marijuana would have had a sedative effect that could have caused Defendant to be unaware of his surroundings. (*Id.*) The mushrooms, he indicated, would have induced a psychological state

---

[4] The officers deny ever making such a promise. (*Id.* at 91, 111.)

[5] Dr. Aks noted, however, that outside of the hypothetical context, getting reliable information on what a subject has ingested can be "tricky" because self-reported histories, which are unreliable, are generally all the information that is available. (*Id.* at 239.)

that includes psychosis, hallucinations, visual disturbances, and hearing voices. (*Id.*) And the Percocet and Xanax would cause drowsiness, whereas ecstasy would be a stimulant and, in higher doses, have a hallucinogenic-like effect. (*Id.*) Taken together, Dr. Aks stated that these substances could have a synergistic effect and cause an enhanced reaction. (*Id.* at 238.) Thus, assuming Defendant took all of the drugs listed in the hypothetical, Dr. Aks concluded that Defendant would have been incapable of knowingly and intelligently waiving his *Miranda* rights or otherwise confessing. (*Id.* at 245-46.)

## **LEGAL STANDARD**

Evidence obtained from a defendant in custody may not be used against him unless he has first been warned that he has a right to remain silent, that anything he says can be used against him in a court of law and that he has a right to consult with an attorney. *Miranda v. Arizona,* 384 U.S. 436, 478 – 479 (1966). Any waiver of these rights must be made voluntarily, knowingly, and intelligently. *Id.* at 444, 475. The Seventh Circuit has identified a number of factors relevant to this inquiry, including "the nature and duration of the questioning, whether the defendant was prevented from eating or sleeping, and whether the defendant was under the influence of drugs or alcohol." *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997). Courts also consider "the defendant's age, intelligence, education, and experience with the criminal justice system." *Id.*

## **DISCUSSION**

As is often the case, factual issues predominate in the determination of this motion. To that end, Defendant makes two separate but related arguments: first, he claims he was so intoxicated that he was unable to knowingly and intelligently waive his rights; and second, he

asserts that his state of intoxication combined with the false promise to allow him to go home if he waived his *Miranda* rights and gave a statement, rendered his waiver involuntary.

In a limited sense, the Court agrees with Defendant's theory: if he indeed ingested the huge cocktail of substances he claims, then his testimony regarding his distorted state of mind and Dr. Aks' conclusion that he was unable to intelligently waive his Fifth Amendment rights would carry great weight. But the lynchpin to their stories is missing. There is simply no reliable evidence that Defendant was impaired, much less to the extent he claims.

Above all, Defendant's testimony is littered with implausibilities. On his account, he first felt the influence of the drugs in the SUV as he was being taken to the ground (during his arrest after the traffic stop). (Tr. 141-143.) Yet, all three officers — Agent Waller, TFO Thomas, and Officer Isom — testified that Defendant did not appear intoxicated throughout the course of the four-hour interview. This observation is confirmed by Defendant's lucid behavior during the interview, where he was able to (1) give the agents two different telephone numbers and addresses from memory for his residence, (2) describe who was in the vehicle with him at the time of the stop and where they were seated, and (3) accurately, and with great detail, recall past events upon which his arrest was predicated.

This last point bears emphasis. Defendant recalled the numerous specific items taken from the safe during the burglary and how they were divided. He remembered making six gun running trips to Chicago beginning in February 2014. He provided the nickname of one of the persons to whom guns in Chicago were sold. He identified persons from photographs. And he recounted how he disposed of at least some of the proceeds he kept from the burglary. It is difficult to countenance such a large amount of detailed information about past events (over a

significant period of time) with Defendant's claim that he was under the influence of seven blunts of marijuana, three Xanax pills, one ecstasy pill, twelve grams of hallucinogenic mushrooms, and three Percocet pills.

Defendant's contention that he did not read or understand the written confession is also hard to stomach, considering that he *initialed various corrections throughout the document and then signed it.* Thus, he was clearly capable of reading and understanding the content of the confession to the extent of being able to correct perceived errors. Defendant's strategic behavior during the interview only underscores this point: after being confronted with specific details about the burglary, he was able to adjust his thinking to take into account this new information and make a reasoned decision to change his initial strategy of denial and cooperate instead. This is the same type of thinking that one would employ in determining whether it is to his benefit to waive his *Miranda* rights and cooperate. What we have, then, is not a picture of a hallucinatory, confused, or drug-addled mind, but rather a person who understood exactly what he was being told.

Beyond the implausibility Defendant's testimony, we also have testimony of the officers, who each stated that Defendant was acutely aware of what was happening at every step of the proceedings. At no point did the officers observe any telltale signs of intoxication, such as slurred speech or bloodshot eyes. Nor did they see any signs that Defendant was dazed or confused – a point which Defendant himself confirmed. To the contrary, the officers observed a coherent criminal defendant who was able to recount complex past events with specificity and clarity, and who had a fairly developed understanding of the criminal process, as evidenced by his strategic behavior and by his comment about whether federal prosecutors could charge him

significant period of time) with Defendant's claim that he was under the influence of seven blunts of marijuana, three Xanax pills, one ecstasy pill, twelve grams of hallucinogenic mushrooms, and three Percocet pills.

Defendant's contention that he did not read or understand the written confession is also hard to stomach, considering that he *initialed various corrections throughout the document and then signed it.* Thus, he was clearly capable of reading and understanding the content of the confession to the extent of being able to correct perceived errors. Defendant's strategic behavior during the interview only underscores this point: after being confronted with specific details about the burglary, he was able to adjust his thinking to take into account this new information and make a reasoned decision to change his initial strategy of denial and cooperate instead. This is the same type of thinking that one would employ in determining whether it is to his benefit to waive his *Miranda* rights and cooperate. What we have, then, is not a picture of a hallucinatory, confused, or drug-addled mind, but rather a person who understood exactly what he was being told.

Beyond the implausibility Defendant's testimony, we also have testimony of the officers, who each stated that Defendant was acutely aware of what was happening at every step of the proceedings. At no point did the officers observe any telltale signs of intoxication, such as slurred speech or bloodshot eyes. Nor did they see any signs that Defendant was dazed or confused – a point which Defendant himself confirmed. To the contrary, the officers observed a coherent criminal defendant who was able to recount complex past events with specificity and clarity, and who had a fairly developed understanding of the criminal process, as evidenced by his strategic behavior and by his comment about whether federal prosecutors could charge him

with state law criminal violations.

In sum, the Court finds that Defendant's claim that he was under the influence of various mind altering drugs to such an extent that he was unable to knowingly, intelligently and voluntarily waive his Miranda rights is contradicted by (i) the credible testimony of the law enforcement officers in this case, (ii) the signed confession with appropriate corrections made by the defendant himself, (iii) Defendant's ability to recount in substantial detail both past and present events, some of which could not have been known to the police officers prior to the interrogation, and (iv) Defendant's ability to make strategic determinations regarding whether to cooperate during different stages of the interrogation.

In addition, the Court finds Defendant's assertion that his confession was involuntary because it was induced by false promise of freedom is likewise contradicted by the credible testimony of all of the officers. Further, the Court notes that Defendant has previously been arrested on at least four occasions and previously convicted of possession of cannabis, aggravated battery, battery, and possession of heroin and cocaine. He is thus a sophisticated person in terms of dealing with police officers in arrest situations and with the criminal justice system in general. He is not a novice who is likely to have been significantly influenced even if such a promise had been made. Indeed, when questioned about the promises allegedly made by the police, he stated that "[he] doesn't believe in promises." (Tr. at 217.) Therefore, his motion to suppress is denied.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress [80] is denied.

SO ORDERED.                     ENTERED:  December 8, 2015

_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**